IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR  21–07–M–DWM |
| Plaintiff, | |
| vs. | OPINION |
| | and ORDER |
| RASTESFAYE ALPHA NEIL, | |
| Defendant. | |

Defendant Rastesfaye Alpha Neil is charged with transportation of illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).  (Doc. 10.)  The charge arises out of a January 23, 2021 vehicle stop initiated near the international border between the United States and Canada.  Neil seeks to suppress three categories of evidence: (1) all evidence resulting from the initial stop of the black Nissan sedan; (2) evidence extracted from electronic devices, including cell phones, after the warrantless seizure of those electronic devices; and (3) Neil's custodial statements relating to ownership of cell phones that were obtained after he invoked his *Miranda* rights.  (Doc. 19.)  A suppression hearing was held on April 14, 2021; the government called three witnesses, Border Patrol Agents Joshua Long, Tyrell Eslick, and Jeffrey Peterman.  Based on the parties' briefing and the testimony presented in court, the motion to suppress is denied with limited exception.

1

## FACTUAL BACKGROUND

The factual background is taken from law enforcement reports, trail camera images, and the agents' testimony.  There is no video footage.[1]  (*See* Doc. 20 at 6.)

## I.    The Initial Stop

At approximately 8:55 a.m. on January 23, 2021, trail cameras in the West Kootenai area of the international border between the United States and Canada captured images of three subjects with backpacks wearing black or camouflage parkas walking southbound in Canada toward the border.  (Doc. 20-1 thru 20-5; *see also* Doc. 21-3 (captured image); Doc. 21-1 (aerial image of border cross area).)  A minute later, a second camera captured one of the three subjects entering the United States illegally by crossing over a barbwire fence.  (Doc. 20-1 thru 20-5.)  The images were transmitted in real-time to the Eureka Border Patrol Station. Approximately 25 minutes later, Border Patrol Agents Joshua Long, Warren Barker, and Kase Kossman responded to the area of the trail activations by vehicle. (*See* Doc. 20-2.)  Agents Long and Barker were in one vehicle and Agent Kossman was following behind in a second vehicle.  (*Id.*)  While in route, Agent Barker "spotted a black Nissan sedan traveling southbound bearing temporary tags near

---

[1] At the hearing, Agent Long stated that the Border Patrol does not utilize either dash or body cameras.  However, testimony from Agent Peterman indicates that there may have been dash and/or body cam footage taken by local law enforcement at the crash scene.  (*See also* Doc. 21-4 (still image from a dash camera).)  No such footage was provided to or reviewed by the Court.

the West Kootenai dumpster site." (Doc. 20-3.)  Given the temporary tags, the number of occupants, and the proximity to the trail camera activations, Agent Barker decided to turn around to follow the vehicle and conduct a vehicle stop. (*Id.*)  While the Nissan initially yielded to Barker's emergency lights, it sped away as Agents Barker and Long approached on foot.  (*Id.*)  At the hearing, Agent Long stated that he got close enough to the Nissan to hear the occupants yelling in a foreign language and to grab the rear passenger door handle.  But he clarified that the car sped off before he could open the door or make contact.  He stated that this contact occurred about 4 miles from the border and that the windows on the vehicle were fogged.  The testimony established the driver of the Nissan kept his foot on the brake, illuminating the brake lights and indicating that the Nissan was never in put in "park" before it sped off.

## II.    The Chase

Agents Barker, Long, and Kossman initially pursued the Nissan south on West Kootenai Road but lost sight of it.  (*Id.*)  The pursuit was picked up by Agent Tyrell Eslick, who was located at the West Kootenai (Koocanusa) Bridge, where the road intersected with Highway 37.  (Doc. 20-1.)  The Nissan passed Agent Eslick and headed north on Highway 37 towards Eureka.  (*Id.*)  Agent Eslick was only able to maintain visibility of the vehicle until it passed the Eureka cemetery, (*id.*), at which point the pursuit was taken over by Lincoln County Sheriff's Deputy

Salyer and Eureka City Office Steve Iker, (Doc. 21-5 at 15; Doc. 21-6 at 6–7).

Deputy Salyer unsuccessfully attempted to stop the Nissan before it reached

Eureka, but the vehicle "blew past" him.  (Doc. 21-6 at 6.)  Officer Iker then

followed the vehicle south on Highway 93 through Eureka, indicating that it

maintained speeds of 80 to 100 miles per hour.  (Doc. 21-5 at 15.)

The Nissan continued, approaching Whitefish from the north, at times

exceeding 120 to 130 miles per hour.  (*Id.*)  The Flathead County Sheriff's Office

took over the chase and the Whitefish Police Department and the Montana

Highway Patrol successfully spiked the vehicle tires one mile north of Whitefish.

(Doc. 21-6 at 1; Doc. 20-5 at 4)  Ultimately, the Nissan went into a ditch over 76

miles from where the stop had been initiated.  (Doc. 20-2; *see also* Doc. 21-4

(images of Nissan in ditch); Doc. 21-2 (satellite image of chase route).)  One of the

occupants, Christopher White, fled into the woods and the other three, including

Neil, were arrested without incident.  (Doc. 21-6 at 1.)  Neil had been driving,

(Doc. 20-3), and he and White were briefly taken to the hospital before being

detained at the Whitefish Border Patrol Station, (Doc. 20-5 at 5).  The other two

occupants, Afrah Ahmed Abdi and Naseem Mohammed, were also taken to the

Station.  (*Id.*)

## III.   The Search and the Station

As made clear at the suppression hearing, the order of events at the accident

scene is confusing.  Although it was not discussed at the hearing, law enforcement reports indicate that once the scene was secured, Border Patrol Agent Adam Peacock deployed his service canine (Havoc) to conduct a search of the Nissan for illegal narcotics or concealed persons.  (Doc. 21-5 at 5.)  Havoc alerted to the presence of drugs.  (*Id.*)  According to Agent Eslick's written report, through the vehicle's window, officers could see clear plastic bags on the floor of the back seat containing what appeared to be marijuana and pharmaceutical pills.  (Doc. 20-1.) Following a subsequent search, Agent Peacock recovered 19.4 grams of marijuana and 20 oxycodone pills from the floor behind the driver's seat.  (Doc. 21-5; Doc. 20-1.)  Agent Eslick's written report indicates that at that same time, he "recovered several electronic devices that were found in various locations inside the vehicle" and turned them over to Agent Dylan MacGregor.  (Doc. 20-1.)

But on the point of the electronic devices, Agent Eslick's hearing testimony differs slightly.  According to Agent Eslick's testimony as opposed to his report, he did not arrive on the scene until after all four individuals had been pat down and secured.  And, he did not personally recover any electronics from the vehicle. Rather, he testified that he was handed various devices and personal effects by local law enforcement on the scene.  He admitted that he did not know who took the phones out of the Nissan, though he stated that believes the Highway Patrol specifically handed him the driver's phone.  He then held on to the personal effects

(such as wallets and IDs) and phones in a single ziplock bag until Agent Peterman returned to the scene to retrieve them. Agent Eslick ultimately remained with the Nissan until it was towed to the Whitefish Border Patrol Station. (*Id.*)

At the Whitefish Station, Agent Peterman was put in charge of identifying and processing the suspects. At the hearing, he testified that they immediately requested counsel and stated that they did not want to talk until a lawyer was present. Agent Peterman read each of the four individuals their *Miranda* warnings per service form CBP-214. (Doc. 20-5 at 5.) According to Agent Peterman, "[a]ll four individuals stated that they understood their rights and declined to answer questions regarding their illegal entry into the US or subsequent pursuit in the black Nissan." (*Id.*) Only Neil signed the rights acknowledgement form but the other individuals "insisted that their items from the vehicle be returned to them." (*Id.*) Agent Peterman also noticed that White, Mohammed, and Abdi all appeared to be dressed for extremely cold weather; they had on multiple pairs of socks, sweatpants over jeans, and two or three shirts each. (*Id.*) Notably, the temperature at the border that morning was 10 degrees Fahrenheit. (*Id.* at 3.)

Law enforcement conducted record checks on all four individuals, successfully identifying all but Mohammed.[2] (*Id.* at 5–6.) Abdi was identified as a

---

[2] Following his release, Mohammed was identified on as "a well-known, well-documented, and high-ranking member of the Brothers Keepers gang" in British Columbia. (Doc. 20-5 at 6.) He was reported to be involved in narcotics

lawful permanent resident of the United States and a citizen of Somalia, but with an extradition warrant out of Canada for second degree murder.  (*Id.* at 5.)  White was identified as a citizen of Jamaica with legal status in Canada, though he had been previously deported from the United States.  (*Id.*)  Neil was identified as a United States citizen residing in Washington, DC.  (*Id.* at 6.)  Neil had flown up to Kalispell on January 21, rented the Nissan, and had a return ticket for January 24.  (*Id.* at 6, 7.)  Law enforcement also discovered that Neil had stayed at the County Inn & Suites in Kalispell on the night of January 21.  (*See* Doc. 21-7.)

Once the Nissan arrived at the Station, Agent Peterman "inventoried the personal property and removed it from the black Nissan in order to facilitate the transfer of the vehicle back to Enterprise Rental Company."  (Doc. 20-5 at 6.)  During that inventory, Agent Peterman found two cans of bear spray; gloves; a stocking cap; and an open black backpack containing a Rolex in its original box with a business card from a jeweler in Vancouver, British Columbia and gold and silver necklaces; three large heavy parkas; a rental car agreement; and a Delta boarding pass and itinerary.  (*Id.* at 6–7.)  The parkas and backpack were consistent with those worn by the individuals captured on the trail camera.  (*Id.* at 7.)

Agent Peterman asked the four individuals "if they would like to identify their property items."  (*Id.* at 8.)  According to Agent Peterman, "[a]ll four

---

trafficking and is suspected of multiple gang-related homicides in Canada.  (*Id.*)

7

individuals affirmatively responded, and advised of which items they would like to claim." (*Id.*)  Mohammed claimed the Rolex and the necklaces, as well as three cell phones.  (*Id.* at 7, 9.)  Neil claimed two cell phones, White claimed three phones, and Abdi claimed an iPad.  (*Id.* at 9.)  Two cell phones went unclaimed, as well as the parkas,[3] the backpack, and the bear sprays.  (*Id.* at 8.)

## IV.     The Cell Phone Data

The ten cell phones were subsequently searched pursuant to a search warrant.  (*See* Doc. 20-6.)  They were "examined utilizing specialized forensic techniques in order to download call logs, contact list[s], text messages and other files and data stored on the cellular device and associated SIM card."  (*Id.* at 1; *see also* Doc. 20-7.)  Neil had claimed ownership of the cell phones identified as N-6 and N-7, while White claimed phones N-1, N-2, and N-3.  (Doc. 20-6.)  According to the government, the examination of White's phone, N-3, revealed that he had 18 contacts or call attempts with Neil's phone, N-7, between January 21 and 23.[4]  (*Id.*) According to Agent Peterman, this contact showed "coordinating messages between WHITE and NEAL [sic] arranging for the transportation from West Kootenai to Kalispell as he [White] illegally entered the US on 1/23/2021.  The times are very closely matched to the border sensor activations and trail cam

_____

[3] Mohammed claimed the camouflage parka upon his release.  (Doc. 20-5 at 8.)
[4] Based on his line of inquiry at the hearing, it appears that the defendant disagrees with the government's interpretation of the forensic evaluation of the phones.

photos of the black Nissan Sentra." (*Id.* at 2.)

## ANALYSIS

Neil seeks to suppress three categories of evidence: (1) all evidence resulting

from the initial stop of the black Nissan Sentra sedan; (2) evidence extracted from

electronic devices, including cellphones, after the warrantless seizure of those

electronic devices; and (3) Neil's custodial statements relating to ownership of

particular cell phones that were obtain after he invoked his *Miranda* rights. (Doc.

19.) His challenges are addressed in turn.

## I.     Legality of Stop

Neil first argues that the initial stop was unlawful because no reasonable

suspicion or probable cause existed at the time the Border Patrol agents saw the

Nissan on the West Kootenai Road. In response, the government argues that

(1) officers do not need justification to stop or search a vehicle at the border;

(2) there was reasonable suspicion for an "extended border" search; and (3) the

Nissan was not "seized" until after the car chase. While all three arguments are

persuasive, the final one is dispositive.

 "The Fourth Amendment prohibits unreasonable seizures to safeguard the

rights of the people to be secure in their persons." *Torres v. Madrid*, 141 S. Ct.

989, 993 (2021) (internal quotation marks and alteration omitted). "Seizure,"

therefore, is a threshold requirement. A "seizure" of a person "can take the form of

9

'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Id.* at 995 (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).  It is undisputed that no physical force was used on Neil at the time of the initial stop. Thus, because the agents' use of emergency lights to make the Nissan pull over was a "show of authority," the question is whether Neil was seized even though he fled before the agents were able to make contact.  He was not.

"[O]ne who flees upon a show of authority is not seized until he or she is physically apprehended." *United States v. Santamaria-Hernandez*, 968 F.2d 980, 983 (9th Cir. 1992); *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (holding that a running suspect was not seized until tackled); *Brower v. Cty. of Inyo*, 489 U.S. 593, 597–98 (1989) (not even considering the possibility that suspect seized during police car chase).  Here, the law enforcement reports and Agent Long's testimony show that the agents were approaching the Nissan on foot when it fled. While Agent Long was able to reach the rear passenger door and begin to move the handle, he was not able to actually open the door or make contact before the Nissan pulled away.  Moreover, the brake lights remained lit, indicating that Neil never put the vehicle in park.  Thus, Neil was not "seized" for Fourth Amendment purposes until he was physically apprehended by law enforcement at the end of the car chase.  And, "[t]he determination whether agents have founded suspicion to justify a stop may take into account all of the events that occur up to the time of the

10

physical apprehension of a suspect who flees." *Santamaria-Hernandez*, 968 F.2d at 983. Because there is no dispute that probable cause to arrest Neil existed following the high-speed chase, this argument forecloses Neil's Fourth Amendment challenge to the initial stop.

But even if Agent Long touching the door handle was enough to trigger the Fourth Amendment, "[t]he border search doctrine is a partial exception to the Fourth Amendment's limitations on searches and seizures." *United States v. Guzman-Padilla*, 573 F.3d 865, 877 (9th Cir. 2009) (citing *United States v. Ramsey*, 431 U.S. 606, 616–19 (1977)). "Because the Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border, border searches are generally deemed reasonable simply by virtue of the fact that they occur at the border."[5] *United States v. Cotterman*, 709 F.3d 952 , 960 (9th Cir. 2013) (en banc) (internal quotation marks, alterations, and citations omitted). "Border searches need not occur at an actual border, but may take place at the 'functional equivalent' of a border, or at an 'extended' border." *Guzman-Padilla*, 573 F.3d at 877 (quoting *United States v. Cardona*, 769 F.2d 625, 628 (9th Cir. 1985)).

"Searches conducted at the functional equivalent of a border require no

---

[5] Even though this is a seizure question—as opposed to a search question—
*Guzman-Padilla* clarifies that "Fourth Amendment seizures may be analyzed
entirely within the confines of the border search doctrine." 573 F.3d at 882.

suspicion, provided that they are not 'unreasonably intrusive.'" *Id.* (quoting

*United States v. Seljan*, 547 F.3d 993, 1002–03 (9th Cir. 2008) (en banc)).  Here,

the agents attempted to stop the Nissan 4 miles from the international border on the

only road that accesses the area in the winter.  Thus, the location of the stop meets

the functional equivalent test.

However, officers must also "possess a reasonable certainty that a border has

been crossed, either by the vehicle in question, or by contraband suspected to be

within the vehicle."  *Id.* (internal quotation marks omitted).  This is assessed by

"examining the totality of the surrounding circumstances, including the time and

distance elapsed from the border as well as the manner and extent of surveillance."

*Guzman-Padilla*, 573 F.3d at 889 (internal quotation marks and alteration omitted).

"[A]n agent or officer need not have observed the crossing" nor is a "continuity of

surveillance" required.  *Id.* at 879–80 (internal quotation marks omitted).  While

reasonable certainty "is a higher standard than that of probable cause, . . . it does

not require knowledge beyond a reasonable doubt."  *Id.* at 880 (internal quotation

marks omitted).  "Rather, the totality of the facts and circumstances within the

officers' knowledge and of which they have *reasonably trustworthy information*

must be sufficient in *the light of their experience* to warrant a firm belief that a

border crossing has occurred."  *Id.* (internal quotation marks and alteration

omitted).

12

Here, several factors support a finding of reasonable certainty that an illegal border crossing had occurred.  The agents were able to see real-time images of three individuals at or near the international border at approximately 8:55 a.m. the morning of the stop.  There were also images of a single individual crossing the border fence moments later.  Agent Long indicated that it would take persons on foot approximately 10-15 minutes to get to the main road from that location.  Based on what they had seen on the trail cameras, the agents were en route on the West Kootenai Road 20-30 minutes later when they spotted the Nissan.  Agent Long also clarified that during the winter months, the West Kootenai Road provides the only unimpeded access to the area and that it sees very little vehicle travel.  He further testified that they saw only one other vehicle on that road that morning, but it was a truck with a single occupant, no window fogging, and local plates.  It was also located closer to the Koocanusa Bridge.  Agents were also aware of previous smuggling in this area, which they described as "high traffic" for this type of activity.  They also noted that the windows of the Nissan were fogged, which is consistent with wet and cold clothing entering a warm vehicle.  Accordingly, the agents did not need justification to stop the Nissan because the evidence supports the agents' reasonable certainty that an illegal border crossing occurred.  Neil's first challenge is therefore without merit.

**II.   Seizure of the Cell Phones**

13

Neil argues next that even if the stop was lawful, the warrantless seizure of the electronic devices from the interior of the vehicle violated the Fourth Amendment.  Essentially, Neil seeks to extend the holding of *Riley v. California*, 573 U.S. 373, 403 (2014)—which determined that a search warrant was required to access the contents of a cell phone—to the seizure of a cell phone from a vehicle following a lawful arrest.  Neil also raises a factual dispute over whether the cell phones were seized at the accident site or following an inventory search after the vehicle was towed to the Station.  In response, the government argues that the seizure was valid under the automobile exception, the inventory exception, and the community caretaker doctrine.  Because the government is correct on its first point, the inquiry ends there despite the uncertainty as to who first seized the phones.

The automobile exception "allows police officers to conduct a warrantless search of a vehicle if they have probable cause to believe that it contains contraband."  *United States v. Fowlkes*, 804 F.3d 954, 971 (9th Cir. 2015) (internal quotation marks omitted); *see Carroll v. United States*, 267 U.S. 132, 149 (1925).  That is the case even "where an automobile is not immediately mobile." *California v. Carney*, 471 U.S. 386, 391 (1985).  And, "[t]here is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure."  *United States v. Johns*, 469 U.S. 478, 484 (1985).  "A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it

14

contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search." *Id.* "A determination of probable cause is based on a totality of the circumstances known to the officers" considering "the collective knowledge of all the officers involved in the criminal investigation." *Fowlkes*, 804 F.3d at 971 (internal quotation marks omitted).

Here, officers had numerous grounds upon which to search the car. The Nissan and its occupants were suspects in an illegal international border crossing and had just led law enforcement on a 70+ mile high-speed pursuit. And even if that was not enough, once the Nissan was stopped, a canine unit was deployed and altered to the presence of drugs in the vehicle. (Doc. 21-5 at 5.) Officers also saw plastic baggies, marijuana, and pharmaceutical pills through the windows. (Doc. 20-1.) Accordingly, the search of Neil's vehicle—and the attendant seizure of the cell phones—was valid under the automobile exception to the warrant requirement. And, that is the case whether the phones were seized by local law enforcement or Agent Eslick at the scene or removed during Agent Peterman's search back at the Whitefish Station. *See Johns*, 469 U.S. at 484. While this uncertainty may impact chain of custody, it does not bear on the legality of the seizure in the first instance.

Additionally, law enforcement sought and received a warrant before searching the contents of the phones. (*See* Doc. 20-5 at 9; Doc. 20-6 at 1.) As happened here, *Riley* specifically envisions that law enforcement may seize and

secure a cell phone following a lawful arrest to prevent the destruction of evidence while seeking a warrant for the phone's contents. *See* 573 U.S. at 388. And, while Neil appears to dispute what was recovered from the cell phones, he does not challenge the search warrant. As a result, neither the cell phones themselves nor the record of their contents are suppressed on these grounds. Neil's concerns about the forensic reports may be compelling material for cross-examination, however.

## III.    Neil's Statement re Ownership

Finally, Neil argues that law enforcement impermissibly questioned him regarding ownership of certain cell phones after he was *Mirandized* and invoked his Fifth Amendment right to remain silent. He therefore seeks to suppress his identification of certain cell phones as belonging to him. In response, the government argues that the questioning qualifies as a "routine booking" question and that Neil's ownership is admissible under the inevitable discovery doctrine. While the government is ultimately correct as to the phone identified as N-7, Neil's claim of N-6 is suppressed.

### A.    Routine Booking Question

Pursuant to *Miranda v. Arizona*, if an "individual indicates in any manner, at any time prior to questioning, that he wishes to remain silent, the interrogation must cease." *Michigan v. Mosley*, 423 U.S. 96, 100 (1975). "At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement

16

taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.* Such an invocation must be unambiguous. *Berghuis v. Thompkins*, 560 U.S. 370, 381–82, 388–89 (2010). Here, it does not appear to be disputed that Neil unambiguously invoked his right to an attorney and to remain silent. The question then is whether Agent Peterman's inquiry as to ownership of certain items impinged on those rights. "The term interrogation means any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *United States v. Zapien*, 861 F.3d 971, 974–75 (9th Cir. 2017) (internal quotation marks omitted). However, the "routine gathering of background biographical information, such as identity, age, and address usually does not constitute interrogation." *Id.* at 975 (internal quotation marks omitted). Thus, such questions are considered "exempted" from *Miranda*'s coverage and an objective test is used to determine whether certain questioning constituted interrogation. *Id.* "Seemingly routine biographical questions can constitute interrogation if, in light of all the circumstances, the officers should have known that their words or actions were reasonably likely to elicit an incriminating response." *Id.* "In making this determination, the focus is upon the defendant's perceptions" considering "both the questions and the context." *Id.* (internal quotation marks omitted).

Here, even though the Border Patrol was attempting to identify the four individuals, Agent Peterman's request for them to identify their belongings was meant to elicit an incriminating response. Even though Agent Peterman's report suggests that the individuals themselves wanted to claim certain items, (*see* Doc. 20-5 at 8), he clearly believed that having them identify cell phones and outerwear would connect them to the illegal border crossing. For example, he stated at the hearing that he knew that the case "was going to rely on the information, the property that we had recovered to tie [the suspects] back to the border." He also explained in his report that during his search of the Nissan he "discovered several items that lead [him] to believe the occupants had recently crossed the border from Canada into the US." (Doc. 20-5 at 6.) This included the fact that the individuals caught on camera were wearing parkas, a hat, gloves, and a backpack like the ones located in the Nissan:

> Based on my experience as a [Border Patrol Agent], it is extremely likely that the three individuals observed on camera in Canada, as well [as] illegally crossing the border, are the same three individuals that were in the Nissan with NEIL when he crashed during the pursuit. This assessment is corroborated by multiple clothing items that are visible in the photographs captured at the border, which were subsequently found in the vehicle or on the persons found in the vehicle.

(*Id.* at 8.) And, after the clothing items went unclaimed, Agent Peterman stated: "It is highly suspicious that the unclaimed bags and parkas are the same color and style as observed on the individuals crossing the border from Canada." (*Id.*)

Moreover, as it specifically relates to the cell phones, Agent Peterman stated, "In my experience as [a Border Patrol Agent], cell phones and other electronic devices are valuable sources of information.  Smuggled aliens and human smugglers often use cellular devices to plan and coordinate their illicit activity, often times doing so during the commission of the crime."  (*Id.* at 9.)

Because Agent Peterman's inquiry was "so clearly and directly linked to the suspected offense," *Zapien*, 861 F.3d at 976 (internal quotation marks omitted), it does not meet the requirements of a routine booking question.  Neil's statements of ownership were therefore obtained in violation of his Fifth Amendment rights.

### B.    Inevitable Discovery

But even so, the government persuasively relies on the inevitable discovery doctrine for one of the phones, which is an exception to the exclusionary rule.  *Nix v. Williams*, 467 U.S. 431, 440–41 (1984); *United States v. Martinez-Gallegos*, 807 F.2d 868, 870 (9th Cir. 1987) ("The inevitable discovery doctrine applies to fifth amendment violations.").  Under this doctrine, "if the government can establish by a preponderance of evidence that the unlawfully obtained information 'ultimately or inevitably would have been discovered by lawful means,' the exclusionary rule will not apply."  *United States v. Camou*, 773 F.3d 932, 943 (9th Cir. 2014) (quoting *Nix*, 467 U.S. at 444).

Here, the government inevitably would have discovered that Neil owned the

19

phone identified as N-7 (718-736-5223).  The number for that phone was listed on Neil's hotel receipt from the County Inn & Suites.  (*See* Doc. 21-7.)  So, once the search warrant was obtained for the phone, the number could be traced back to Neil.  Neil's connection to the phone was then further verified by a cell phone number lookup performed by Agent Peterman.  Because it was inevitable that N-7 would be connected to Neil, his statement of ownership is not suppressed.

Nevertheless, Neil also claimed N-6 (240-762-3180).  (*See* Doc. 21-8 at 1.) Because there is no evidence in the record that the government could connect N-6 to Neil any other way, the inevitable discovery doctrine does not apply as to that phone.  As a result, Neil's motion is granted to the limited extent that his claim of N-6 is suppressed.

## CONCLUSION

Based on the foregoing, Neil's motion to suppress (Doc. 19) is GRANTED as to his ownership claim of the cell phone identified as N-6 and DENIED in all other respects.

DATED this 15th day of April, 2021.

Donald W. Molloy, District Judge
United States District Court

20